UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BILL GRAHAM ARCHIVES, LLC :
:
                Plaintiff, : 03 CV 9507 (GBD)
:
: MEMORANDUM
        - against - : <u>OPINION & ORDER</u>
:
:
DORLING KINDERSLEY LIMITED, :
DORLING KINDERSLEY PUBLISHING, INC., :
and DONNELLEY & SONS COMPANY, :
:
                Defendants. :
------------------------------------------------------------X
GEORGE B. DANIELS, DISTRICT JUDGE:

      Plaintiff Bill Graham Archives, LLC ("Bill Graham" or "plaintiff") brings suit asserting copyright infringement of seven visual art images by defendants Dorling Kindersley Limited, Dorling Kindersley Publishing, Inc., and R.R. Donnelley & Sons Company (together, "Dorling" or "defendants"). Defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56. Plaintiffs cross-moved for summary judgment. For the reasons stated below, defendants' motion is granted and plaintiff's motion is denied.

BACKGROUND

      The dispute in this copyright infringement action centers on seven reduced images of concert posters reproduced by defendants in their entirety in the book <u>Grateful Dead: The Illustrated Trip</u> ("defendants' book or *Trip*"). There is no dispute that the images were copied. Plaintiff alleges that their single reproduction without permission constitutes copyright

infringement. The seven pieces were used on certain pages of defendants' book as small "thumbnail" reproductions. The images appeared in the book in chronological order.[1]

Defendants' first sought permission to use the pieces when defendants' researcher forwarded a letter to plaintiff from the head of Grateful Dead Productions ("GDP"). The letter described *Trip*, confirmed GDP's participation, and requested plaintiff's cooperation "in order to help make this book the definitive Grateful Dead history" in May 2003. See Def. Ex. T; Gibbs Dep. 172-79. Plaintiff responded by offering permission in exchange for GDP's grant to plaintiff of rights "to create CDs and DVDs out of our archived audio and video recordings of Grateful Dead concerts." Def. Ex. U. GDP rejected plaintiff's offer and at GDP's instruction Dorling's researcher contacted plaintiff's archivist directly, informing her, *inter alia*, that "[a]t this stage it is hard to estimate exactly which images we would like to use as we are still in the process of designing spreads around the text. We would plan to use the images inside, within a textual context at around 1/2 page each and would require clearance for world rights." Def. Ex. W. Plaintiff responded "[o]f course we agree that our posters will greatly enhance any Grateful Dead book and would be open to negotiating a licensing contract with you. Licensing fees are within industry standards and based on poster series type, image size, number of images, and quantity of

---

[1] The first image appears on page 76 and denotes a September 1967 Jefferson Airplane/Grateful Dead show. The original size was 14" x20-5/8"; in the book it appears in a smaller size 2-3/16" x3-1/4". The second image appears on page 103 and marks two October 1969 Jefferson Airplane/Grateful Dead concerts. The original size was 14" x 21-1/16"; in the book the image is seen in 2-15/16" x 4-5/16" dimensions. The third poster image is seen on page 130, appearing as a ticket for a 1968 concert on May 16-18 at Graham's famous Fillmore Auditorium. The ticket was recycled by being stamped on the back for a May 30 1971 concert at Winterland, another Bill Graham venue. The original size of the poster image on page 130 was 13-15/16" x 20-1/16", whereas the image in the book has the following dimensions: 1-1/16" x 1-9/16". The fourth image is seen on page 254 (2-9/16" x 3-5/8"). That poster was used for a series of fifteen September 1980 shows at the Warfield Theatre in San Francisco; the original size was 19-1/2" x 27-3/4".

The final three posters chronicle New Year's Eve shows. The poster appearing on page 361 marking the 1988 show has 2-11/16" x 3-15/16" dimensions in the book and 13" x 19-1/2" dimensions in the original. The poster appearing on page 397 marking the 1991 show has 2-13/16" x 1-13/16" dimensions in the book and 13" x 19-1/2" dimensions in the original. The final poster appearing on page 421 is a "fake in-house poster" with 2-11/16" x 3-7/8" dimensions in the book and 13" x 19" dimensions in the original. This final poster marks a 1993 New Year's show that never happened because the tradition that began in 1966 did not survive Graham's death in October 1991.

books being printed." Id. By autumn 2003, Dorling's researcher had cleared permission for the bulk of the visual material to be included in *Trip,* including six of seven works in which Bill Graham claims rights in this lawsuit: the New Year's Eve 1988 and 1991 posters, Def. Ex. X; the 1969 Jefferson Airplane/Grateful Dead poster, Def. Ex. Y; the 1993 "fake" New Year's poster, Def. Ex. Z; the 1980 "Warfield" poster, Def. Ex. AA; and the reused ticket, Def. Ex. BB. On October 23, 2003, Dorling's researcher again contacted plaintiff for permission to use two images in which plaintiff had asserted rights: the September 1967 "Airplane/ Dead" poster that appears on page 76 of *Trips*; and a 1966 Jefferson Airplane/Grateful Dead Fillmore concert poster reproduced on page 58. Def. Ex. S. Plaintiff's representative responded with an offer to "license these two images for $2500. each poster or $5000. in total," Def. Ex.CC.[2] On November 17, plaintiff sent Dorling's researcher two emails, stating that "you included at least 3, if not more, images that we own and have the copyright to," and that "if we do not have an agreement by close of business tomorrow, I will instruct Thelen Reid to take the most aggressive action possible." Def. Ex. DD.

Plaintiff thereafter brought suit, alleging copyright infringement under the Copyright Act. Plaintiff seeks, among other things, to enjoin defendants' further distribution of the *Trip*, the destruction of all unsold books, as well as actual and statutory damages. Defendants moved for summary judgment, contending that their reproduction of the images constitutes fair use of the copyrighted works pursuant to Section 107 of the Copyright Act. Plaintiff cross-moved for summary judgment. The sole issue before this Court is whether defendants' use of plaintiff's work constitutes fair use under the Copyright Act.

---

[2] Bill Graham has made no claim regarding the 1966 Fillmore poster in this lawsuit, notwithstanding Bill Graham's previous demand for a $2,500 license fee for its use in *Trip*.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under this rule, the moving party bears the initial burden of demonstrating that the evidence fails to raise a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). After such a showing, the non-moving party must respond with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" to show that there is a genuine issue for the trier of fact to resolve. D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

When deciding the motion, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in favor of that party. See Schneider v. Feinberg, 345 F.3d 135, 144 (2d Cir. 2003). The Court's role is not to resolve disputed matters it may find in the record, but merely to determine, as a threshold matter, if any exist. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Gibson v. American Broad. Cos., 892 F.2d 1128, 1132 (2d Cir. 1989).

In order to establish a claim of copyright infringement, the plaintiff must establish (1) ownership of a valid copyright and (2) unauthorized copying or a violation of one of the other exclusive rights afforded copyright owners pursuant to the Copyright Act. See Twin Peaks Productions v. Publications Int'l. Ltd., 996 F.2d 1366, 1372 (2d Cir. 1993). Although defendants in the present case disagree that plaintiff owns a valid copyright to the concert posters, "the defense has made its summary judgment motion solely on the ground that [their reproduction in

4

*Trip*] is a fair use as a matter of law." Transcript of oral argument dated January 19, 2005 at 3. Because a finding of fair use negates any liability stemming from defendants' use of the posters, the validity of plaintiff's claim of copyright ownership need not be decided.

FAIR USE

"From the infancy of copyright protection," the fair use doctrine "has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 575, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (quoting U.S. Const., art. I, §8, cl.8). "[I]n truth, in literature, in science and art, there are, and can be few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before." Id. Until the 1976 Copyright Act, the doctrine of fair use grew exclusively out of the common law. See id., at 576; See Folsom v. Marsh, 9 F.Cas 342, 348 (C.D.Mass 1900) (CCD Mass. 1841) (Story, J.).

With the Copyright Act, Congress restated the common law tradition of fair use. The statute provides that the use or reproduction of a copyrighted work is "not an infringement of copyright" if it is used "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." 17 U.S.C. § 107. In determining whether the work has been used for such a purpose, the statute lists four nonexclusive factors to consider: 1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; 2) the nature of the copyrighted work; 3) the amount and substantiality of the portion used; and 4) the effect of the use upon the potential market for, or value of, the copyrighted work. 17 U.S.C. §107(1)--(4).

5

This section of the Copyright Act "intended that courts continue the common law tradition of fair use adjudication" and "permits and requires courts to avoid rigid application of the copyright statute, when, on occasion, it would stifle the very creativity that law is designed to foster." Campbell, 510 U.S. at 577. Fair use analysis therefore, always "calls for a case-by-case analysis." Id. The fair use examples provided in §107 are "illustrative and not limitative" and "provide only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses." Id.; Nimmer §13.05 [A], at 13-153 ("The factors contained in Section 107 are merely by way of example, and are not an exhaustive enumeration.") The ultimate test of fair use, therefore, is whether the copyright law's goal of "promot[ing] the Progress of Science and useful Arts," U.S. Const., art. I §8, cl., 8, "would be better served by allowing the use than by preventing it." Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1077 (2d Cir. 1992) (quoting Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 589 (2d Cir. 1960). The burden of proof is on the defendants to demonstrate fair use. See Infinity Broadcast Corp. v. Kirkwood, 150 F.3d 104, 107 (2d Cir.1998). Though recognizing that fair use is a "mixed question of law and fact," courts regularly resolve fair use issues at the summary judgment stage where there are no genuine issues of material fact. Castle Rock Entertainment, Inc., v. Carol Publishing Group, Inc. 150 F.3d 132, 136 (2d.Cir.1998).

1. The Purpose and Character of the Use

The first fair use factor to consider is "the purpose and character of the [allegedly infringing] use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. §107(1). There is a strong presumption in the Second Circuit that this factor favors the defendant if the allegedly infringing work fits within the Section 107 preamble uses: criticism, comment, or research. "[B]iographies in general, and critical

biographies in particular, fit 'comfortably within' these statutory categories 'of uses illustrative of uses that can be fair.'" New Era Pubs v. Carol Publ'g Group, 904 F.2d 152, 156 (2d Cir. 1990). "[B]iographies, of course, are fundamentally personal histories and it is both reasonable and customary for biographers to refer to and utilize earlier works dealing with the subject of the work and occasionally to quote directly from such works." Maxtone-Graham v. Burtchaell 803 F.2d 1253, 1263 (2d Cir. 1986). Plaintiff does not contest that *Trip* is a biographical work. "The backbone of the book is the Timeline, an encyclopedic entity that snakes throughout these pages and from which all entries and features hang. Every one of the band's 30 years together is covered page by page, month by month." Publisher's Note, The *Trip* at 6. It is undisputed, therefore, that *Trip* is a biographical work.

The more important question under the first factor, and in fair use analysis generally, is whether the allegedly infringing work "merely supersedes" the original work "or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message," in other words "whether and to what extent the new work is 'transformative.'" Campbell, 510 U.S. at 579 (quoting Leval, Towards a Fair Use Standard, 103 Harv.L.Rev 1105, 1111 (1990)). If "the secondary use adds value to the original - if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings - this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." Id. Defendants' book is a biography constructed in the form of a written and visual timeline that includes the seven contested thumbnail Grateful Dead poster images and one ticket image. The thumbnail use of the images placed in chronological order on the timeline is transformatively different from their mere expressive use as posters and tickets.

In the defendants' book, the images are used to commemorate historic events that occurred. Unlike in Ringgold, where the poster in question was used as a clearly visible piece of set decoration in a television program, the posters here are isolated examples across the career of shows performed by the Grateful Dead. See Ringgold v. Black Entertainment Television, Inc., 126 F.3d 70, 79 (2d Cir. 1997) ("The defendants have used Ringgold's work for precisely a central purpose for which it was created -- to be decorative.") Defendants' use is not decorative and does not simply replicate each piece in its original form. The Grateful Dead posters are used, in conjunction with other pieces of visual art and photographs in a creative layout. This use is sufficiently transformative, and different from the original purpose to advertise, draw attention to and solicit listeners to an event, such that the market is not one expected to be reserved to the copyright holder. Nor is it reproduced for purely aesthetic value. In addition, the significant reduction to thumbnail size of the images indicates an entirely different use of the image. See Update Art, Inc. v. Maariv Israel Newspaper, Inc., 635 F.Supp. 228, 232 n.6 (S.D.N.Y. 1978) (Noting that photos reproducing a poster in sizes of "5" x 6" and 2 ½" x 2 ½" … are not as susceptible to a use that would compete with plaintiff's product," but that a photo 8 ½" x 11" "is likely to.") As stated in Campbell, the goal of copyright "is generally furthered by the creation of transformative works." Id. at 579. The transformative nature of the images supports a finding in favor of defendants.

That defendants' book was commercially released does not preclude fair use. The Supreme Court has stated that even the Section 107 illustrative fair uses "are generally conducted for profit in this country." Id., at 584. The specific use of the images in dispute- such that they were drastically reduced in size and were not used to directly attract sales of the book suggests that the commercial importance is minimal. See Campbell, 510 U.S. at 579, 114 S.Ct. at 1171

("the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use"); see also Sandoval v. New Line Cinema Corp., 973 F.Supp. 409 (S.D.N.Y. 1997) (finding that defendants use of plaintiff's photographs was transformative, "in the sense that defendants used the visual images created in plaintiff's work in furtherance of the creation of a distinct visual aesthetic and overall mood" and "did not use the Photographs to promote" the film). The first factor, therefore, weighs heavily in favor of defendants.

2. Nature of the copyrighted work

The second fair use factor to consider is "the nature of copyrighted work," § 107(2). This section relates to whether the original work is "'creative' as opposed to 'factual,' as well as to whether the work has been previously published." Feiner v. H.R. Industries, 10 F.Supp.2d 310, 314 (S.D.N.Y.1998). Original works that are creative in nature will generally receive greater copyright protection. See e.g. Ringgold, 126 F.3d 70 at 80 (2d Cir. 1997).

The creative nature of plaintiff's posters places them in the "core of intended copyright protection." Campbell, 510 U.S. at 586. Although this appears to favor plaintiff, courts have recognized that "this factor may be of less (or even of no) importance when assessed in the context of certain transformative uses." Castle Rock Entertainment, Inc., v. Carol Publishing Group, Inc., 150 F.3d 132, 144 (2d Cir. 1998); see also Leibovitz v. Paramount Pictures Corporation, 2000 WL 1010830, 4 (S.D.N.Y.2000) ("It is well established that the second factor – the nature of the copyrighted work- is not very important to the fair use analysis.")

The works appropriated have been previously published. Previous publication "is critical to its nature under factor two," since fair use is narrowed for unpublished works. This circuit has mitigated the importance of creativity in the second factor where a work is "a published work

9

available to the general public," Arica Inst., 970 F.2d at 1078. In these cases it is typical for the court to find the second factor to slightly favor plaintiffs, recognizing the broader latitude given to claims of fair use for published works. See New Era Pub., 904 F.2d at 157 (2d Cir. 1990) (Harper & Row, Pub., Inc. v. Nation Enterprises, 471 U.S. 539, 564, 85 L. Ed. 2d 588, 105 S. Ct. 2218 (1985)). The second fair use factor therefore favors plaintiff.

      3. Amount and Substantiality of the Portion Used

The third factor considers "whether the amount and substantiality of the portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose of the copying." Campbell, 510 U.S. at 586. There is both a qualitative and quantitative dimension to this analysis. See New Era Publications Int'l ApS v. Carol Pub. Group, 904 F.2d 152, 158 (2d Cir. 1990). Quantitatively, the third factor looks to the degree to which the original work was copied. While copying a work in its entirety "does not preclude a finding of fair use, it militates against such a finding." American Geophysical Union v. Texaco Inc., 60 F.3d 913, 926 (2d Cir. 1994). This "inquiry must focus upon whether 'the extent of . . . copying' is consistent with or more than necessary to further 'the purpose and character of the use.'" Castle Rock Enter. v. Carol Publishing Group, 150 F.3d 132, 144 (2d Cir. 1998) citing Campbell, 510 U.S. at 586-87. Moreover, this factor asks whether the borrowed material forms the "heart" of the original work. Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 565-66, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)(finding that third factor weighed against fair use despite "insubstantial portion" used because quotes used in article were manuscript's "dramatic focal points").

It is undisputed that defendants reproduced seven copyrighted images in their entirety. Each image was reduced to a size of about 2 inches by 3 inches. The single reduced reproductions of the copyrighted material, which occupy, on each page, approximately one tenth

of one page of a 480 page book is reasonable in relation to defendants' transformative purpose for copying. Although each piece is reproduced in their entirety, they form only a small part of a book meant to represent the Grateful Dead's history and are displayed among hundreds of other images and text. These reproductions cannot be said to capture the essence or "heart" of the original work which was initially a full size concert poster. See Harper & Row, 471 U.S. at 565-66, 105 S.Ct. 2218 (finding that third factor weighed against fair use because the copied quotations amounted to "the heart of the book," the part most likely to be newsworthy and important in licensing serialization."). Defendants' use was meant to commemorate certain landmark shows in the Grateful Dead's history. While the fact of these shows could be demonstrated without the use of the thumbnail reproductions of the work, the creative nature of the relevant promotional materials could not be conveyed as effectively without the use of several samples of the work in their entirety. The third factor, therefore, favors defendants.

    4. <u>The Effect upon the Potential Market for the Copyrighted Work</u>

The fourth factor of the fair use analysis looks to "the effect of the use upon the potential market for or value of the copyrighted work." 35 U.S.C. § 107(4). The copyright law is primary concerned with protecting the ability of a copyright holder to exploit the market for his work. Use of a copyrighted work which does not usurp the market for the copyrighted work leans the fourth factor favorably towards fair use. Campbell, 510 U.S. at 593. This also protects markets that the copyright holder could reasonably be expected to enter. Id. at 592. Harm on the market for licensing revenues is a nuanced area in the fair use analysis. See American Geophysical Union v. Texaco Inc., 60 F.3d 913, 929 n.17 (2d Cir. 1994) cert. dismissed, 516 U.S. 1005 (1995) (noting that "were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for

the right to engage in the use, the fourth fair use factor would always favor the copyright holder"); see also Princeton Univ. Press v. Michigan Document Servs., 99 F.3d 1381, 1387 (6th Cir. 1996) (en banc), cert. denied, 520 U.S. 1156 (1997) (finding that wholesale reproductions of a copyrighted work would not produce a cognizable market harm "since this would assume that the copyright holder had a right to such revenues"); see generally Nimmer §13.05 [A][4], at XX-XXX ("it is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar. … [but] how can one prove a potential without simply degenerating into the tautology that defendant occupied a certain niche, which itself proves a potential market to exist and to have been usurped?"). Any uncompensated use involves the loss of potential licenses. If this were the determinative factor, it would render the analysis for the fourth factor meaningless. Some works, however, depend significantly on particular licensing revenues to have any commercial value at all.

Accordingly, "[o]nly an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable" for this factor. American Geophysical Union v. Texaco Inc., 60 F.3d 913, 930 (2d Cir. 1994). This extends not only to the exclusive right of reproduction in a work, but also to the right to create derivative works. See, i.e., Twin Peaks Productions v. Publications Int'l Ltd., 996 F.2d 1366, 1377 (2d Cir. 1993); Paramount Pictures Corp. v. Carol Pub. Group, 11 F.Supp.2d 329, 336 (S.D.N.Y. 1998). Whether a copyright holder is expected to exploit a market depends substantially on whether the use is transformative. A simple change of medium does not suffice. See Rogers, 960 F.2d at 312. Similarly, the fact that a copyright holder has previously secured licenses does not make a given market "traditional, reasonable, or likely to be developed." American Geophysical Union, 60 F.3d at 930. Specifically, a copyright holder could prevent the fourth factor from ever

supporting fair use by licensing parodies, criticisms, or other uses and arguing that any such use that is not licensed invades on a "traditional" market. For this reason the Second Circuit has noted that, "by developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work, a copyright owner plainly cannot prevent others from entering those fair use markets." Castle Rock Enter. v. Carol Publishing Group, 150 F.3d 132, 146 n.11 (2d Cir. 1998). The qualification of a work as transformative therefore informs whether a licensing market should be reserved to the copyright holder. The Court in Castle Rock noted that the infringing work in question was "likely to fill a market niche that Castle Rock would in general develop" since it "borrows exclusively from Seinfeld[, the copyrighted work,] and not from any other television or entertainment programs." Id. at 145.

Plaintiff relies on Ringgold for the proposition that where a licensing market exists for copyrighted works, the fourth factor must weigh in favor of the copyright holder. The District Court in Ringgold held that the use of a poster in a television program would not capture the market for sales of the original, and that plaintiff could not demonstrate a diminution in revenue for the work. The Second Circuit reversed, noting that "[i]n no sense is the defendants' use 'transformative,'" – the work was produced to be decorative, and was used in a decorative way in the program. See Ringgold, 126 F.3d at 79. Reliance on Ringgold is misplaced in this instance, as the character of the allegedly infringing work here is transformative and bears a different relationship to the copyrighted work. The poster in Ringgold was used as decoration in a church, the same use for which the original work was created, and bore no substantial relationship to the television program in which they were used. Indeed, "the thematic significance of the poster and its relevance to the ROC episode are not discernible." Id. Plaintiff's copyright here is in promotional concert posters. The posters are artistic works. Reproducing and selling one of the

works as a poster or artwork would clearly infringe plaintiff's copyright. Even a book that simply compiled the collection of posters in their entirety is something expected of the copyright holder, because the subject matter of the book was the copyrighted work itself. See Twin Peaks, 996 F.2d 1366; see also Paramount, 11 F.Supp.2d 329; see also Castle Rock, 150 F.3d 132. It would be unreasonable, however, to find that defendants have unjustly appropriated plaintiff's market. The use of seven posters, as thumbnails, in a 480 page book, does not produce the type of market harm recognized by the fair use inquiry. The thumbnails are not substitutes for the posters themselves; nor would a collector purchase this book rather than one dedicated to the posters or even copies of the posters themselves. See Update Art, Inc., 635 F.Supp. at 232.

The harm which plaintiff alleges to have suffered is the loss of licensing revenues. A market harm for licensing revenues will only be recognized if the market is "traditional, reasonable, or likely to be developed," and is not a protected transformative use. Defendants' use, however, is transformative, and is not likely to supplant the market, either for reproductions or derivative works, of the original. Plaintiff asserts that the established licensing market for the use of visual works in books supports finding the fourth factor in their favor. In addition, they indicate that if defendants' conduct were widespread, the value of plaintiff's copyrighted works would be eliminated. (Pl. Mem. of Law in Opp'n to Defs.' Mot. For Summ. J. at 24). This overstates the consequence of a finding of fair use in this instance which would permit reduced reproductions, which cannot supplant the market for the original, and are used for a fundamentally different purpose than the original. See, i.e., Update Art, Inc., 635 F.Supp. at 232; Kelly v. Arriba Soft Corp., 336 F.3d 811 (9th Cir. 2003). Plaintiff has not provided any other theory for market harm to justify weighing the fourth factor in its favor. The Court, therefore, finds that the fourth factor also favors defendants.

Although not listed among the factors, courts occasionally consider whether the defendant exercised good faith. See e.g. Fisher v. Dees, 794 F.2d 432, 436-37 (9th Cir.1986) ("Because fair use presupposes good faith and fair dealing, courts may weigh the propriety of the defendant's conduct in the equitable balance of a fair use determination"). The Supreme Court observed in Campbell that licenses are frequently requested where no license is needed "in a good-faith effort to avoid… litigation." Campbell 510 U.S. at 58 n.18. In Kane v. Comedy Partners, 2003 U.S. Dist. LEXIS 18513, *20 (S.D.N.Y. 2003), this Court held that "defendants' efforts to contact plaintiff and inform… of their plan to use… are evidence of defendants' good faith effort to initially seek… informed consent." The fact that defendants' informed plaintiff of their intentions to use their images and made an effort to license the images where there might be question as to whether a license was needed, shows a good faith effort by defendants. The court thus weighs favorably defendants' conduct in the equitable balance of fair use.

## CONCLUSION

The first factor weighs in favor of fair use since the allegedly infringing work both qualifies as a biography, a presumptively fair use, and does not supplant the market for the original work. See Maxtone-Graham, 803 F.2d at 1263. The second factor, the nature of the original work, weighs slightly in favor of the plaintiff since the posters are creative works that have already been published. See New Era Pub., 904 F.2d at 157 (2d Cir. 1990). However, the third factor, the amount and substantiality of the original taken weighs in favor of defendants. Lastly, there is not a substantial effect on the market for the original work since the transformative nature of the use is outside of the ambit of lost licensing opportunities. See Hofheinz v. A&E TV Networks, 146 F. Supp. 2d 442, 448 (S.D.N.Y. 2001). On balance, the

question as to whether a license was needed, shows a good faith effort by defendants. The court thus weighs favorably defendants' conduct in the equitable balance of fair use.

## CONCLUSION

The first factor weighs in favor of fair use since the allegedly infringing work both qualifies as a biography, a presumptively fair use, and does not supplant the market for the original work. See Maxtone-Graham, 803 F.2d at 1263. The second factor, the nature of the original work, weighs slightly in favor of the plaintiff since the posters are creative works that have already been published. See New Era Pub., 904 F.2d at 157 (2d Cir. 1990). However, the third factor, the amount and substantiality of the original taken weighs in favor of defendants. Lastly, there is not a substantial effect on the market for the original work since the transformative nature of the use is outside of the ambit of lost licensing opportunities. See Hofheinz v. A&E TV Networks, 146 F. Supp. 2d 442, 448 (S.D.N.Y. 2001). On balance, the factors in defendants' favor are controlling in this instance since the purposes of copyright are best served by permitting transformative uses that foster the creation of new works.

The Dorling use of the Bill Graham works is a non-infringing fair use under §107 of the Copyright Act. Accordingly, defendants' motion for summary judgment on the issue of fair use is granted, and precludes plaintiff's motion for summary judgment of copyright infringement. Plaintiff's motion for summary judgment is therefore denied.

Dated: New York, New York
      May 11, 2005                                               SO ORDERED:

_George B. Daniels_
GEORGE B. DANIELS
United States District Judge